Robert L. Bender et al. [1] v. Commissioner. Bender v. Commissioner
Docket Nos. 56618, 56619, 56622.
United States Tax Court
T.C. Memo 1957-121; 1957 Tax Ct. Memo LEXIS 139; 16 T.C.M. (CCH) 502; T.C.M. (RIA) 57121; June 28, 1957
*139 1. Held, that false and fraudulent returns were filed for each of the years 1942-1945, inclusive, and for 1947, by the petitioners, Checker Taxi Company and Robert L. Bender, and that, therefore, deficiencies for those years are not barred by the statute of limitations. 2. Held, that each of the petitioners, Robert L. Bender and Esther C. Bender, received taxable income for each of the years 1942-1948, inclusive, from Checker Taxi Company but the amounts thereof were less than the Commissioner determined. 3. Held, that the deficiencies for each of the years 1942-1947, inclusive, of Checker Taxi Company and of Robert L. Bender were due to fraud with intent to evade tax. Carl Flom, Esq., 1 South Pinckney Street, Madison, Wis., and Suel O. Arnold, Esq., for the petitioners. Thomas E. Donnelly, Jr., Esq., and John E. Owens, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in taxes and 50 per cent additions to the deficiencies under section 293(b), 1939 Code, as follows: Docket No. 56618 - Robert L. Bender
Year
Income Tax
Section 293(b)
1942
$ 1,898.49
$ 949.25
1943
3,606.80
1,470.42
1944
3,719.38
1,859.69
1945
7,187.33
3,593.67
1946
3,372.91
1,686.46
1947
5,524.09
2,762.05
Total
$25,309.00
$12,321.54
Docket No. 56619 -
Robert L. and Esther C. Bender
1948
$288.96
$144.48
Docket No. 56622 - Checker Taxi Company
Income Tax
Deficiency
1942
$ 15.25
$ 309.10
1943
1944
1,253.89
1945
1,441.51
1946
1,509.79
1,159.72
1947
1,798.44
1948
4.31
2.16
$1,529.35
$5,964.82
Declared Value Excess-Profits Tax
Deficiency
1942
$ 931.09
$ 465.55
1943
269.35
134.68
1944
377.12
1945
1,388.22
694.11
$2,588.66
$1,671.46
Excess Profits Tax
1942
$ 5,459.58
$ 2,729.79
1943
19,517.72
8,620.29
1944
2,447.00
3,156.73
1945
2,783.72
2,222.64
$30,208.02
$16,729.45
*140 The Commissioner now concedes that in Docket Nos. 56619 and 56622 additions under section 293(b), 1939 Code, for the year 1948, were improperly added to the deficiencies. The petitioner, Checker Taxi Company, does not contest the determinations of the amounts of the deficiencies in taxes for any of the years involved but it claims that the deficiencies for the years 1942-1945, inclusive, and for 1947 are barred by the statute of limitations. The petitioner, Robert L. Bender, contends that the deficiencies in income tax for each of the years 1942-1947, inclusive, are barred by the statute of limitations. If the deficiencies are not barred, he contends that his taxable income for each year was less than the respondent has determined. If it is determined that there is a deficiency in income tax for any year, the petitioner contends that no part of such deficiency is due to fraud with intent to evade tax under section 293(b). With respect to the year 1948, Robert and Esther Bender contend that their taxable income is less than the Commissioner has determined. The issues are as follows: (1) Whether Checker Taxi Company filed false or fraudulent returns for any of the years 1942-1945, inclusive, *141 and for 1947. (2) Whether Robert L. Bender filed false or fraudulent returns for any of the years 1942-1945, inclusive, and for 1947. (3) With respect to Robert L. Bender, individually, and Robert and Esther Bender, jointly, whether there is a deficiency in income tax for each of the years 1942-1948, inclusive. (4) With respect to Checker Taxi Company, whether all or part of a deficiency for each of the years 1942-1947, inclusive, is due to fraud with intent to evade tax under section 293(b). (5) With respect to Robert L. Bender, if there are any deficiencies in income tax, whether all or part of a deficiency for each of the years 1942-1947, inclusive, is due to fraud with intent to evade tax under section 293(b). Findings of Fact Robert L. Bender and Esther C. Bender, his wife, are residents of Madison, Wisconsin. Robert L. Bender and Esther C. Bender filed individual income tax returns for each of the taxable years 1942-1947, inclusive; they filed a joint return for 1948. All of the returns were filed with the collector of internal revenue for the district of Wisconsin. Checker Taxi Company filed original and amended income tax returns for each of the years 1942-1948, inclusive, *142 with the collector of internal revenue for the district of Wisconsin. Checker Taxi Company, hereinafter referred to as Checker, a Wisconsin corporation, was organized in 1925. At all times since its organization, Checker has been engaged in the business of operating taxicabs, school buses, airline limousines, and various other types of vehicles in and about Madison, Wisconsin. It derived substantially all of its income from the operation of such business during the years 1942-1948, inclusive. Robert and Esther Bender are the original incorporators of Checker. During the years 1942-1948, inclusive, Esther was the president of the corporation, and Bender was the secretary-treasurer. From the date of incorporation through 1947, there were 100 shares of common capital stock of Checker outstanding. Bender owned 90 shares; Esther owned 9 shares; and 1 qualifying share was held by William Hackert. On November 29, 1947, an additional 500 shares of common stock of Checker were authorized, increasing the outstanding stock to 600 shares; 600 shares were outstanding during 1948; and they have remained outstanding. The circumstances surrounding the issuance of the additional 500 shares are set *143 forth hereinafter. When the additional shares of stock were issued, Bender held 495 shares; Esther held 104 shares; and Hackert held 1 share. That is to say, out of the new 500 shares, 405 were issued to Bender, and 95 were issued to Esther. The stock had a par value of $100 per share. On the books of Checker, outstanding stock was recorded as $10,000 until the end of 1947, and it was recorded as $60,000 during 1948, and thereafter. The basis of Bender's and Esther's stock in Checker was $12,470.20 as of January 1, 1942. Bender managed, controlled, and directed the operations of the corporation, Checker, during all of the taxable years, and he was the sole active officer. Esther had almost nothing to do with the operations of Checker during the years 1942-1948, inclusive. Upon his audit of the returns of Checker for each of the years 1942-1948, inclusive, the Commissioner determined the amounts for each of the years 1942-1947, inclusive, of Checker's net deposits in all corporate bank accounts including a bank account in the name of Esther C. Bender; of its cash not deposited in bank accounts but used as currency to make disbursements; and of receipts which were recorded in the books *144 of Checker. He subtracted the amount of nontaxable, unrecorded receipts for each year from total unrecorded receipts, and then computed the amount of Checker's unrecorded taxable receipts for each year. The following schedule sets forth the respondent's determination for each of the years 1942-1947, inclusive, of Checker's total receipts, of its total receipts recorded in its books, of its total unrecorded receipts, and of its total unrecorded receipts which are taxable. Petitioners do not disagree with any of respondent's determinations of these various amounts. They now admit that the receipts which were recorded in Checker's books (as are set forth below) were less for each of the years 1942-1947, inclusive, than Checker's actual total receipts, and that the amount in each year of Checker's unrecorded, taxable receipts is the amount which has been determined by the respondent: Checker Taxi Company
Total
Receipts
Unrecorded
Unrecorded
Year
Receipts
Per Books
Receipts
Receipts Taxable
1942
$ 90,519.54
$ 79,114.40
$ 11,405.14
$ 7,227.70
1943
131,767.21
113,075.45
18,691.76
15,247.89
1944
164,102.24
143,098.50
21,003.74
17,541.17
1945
163,405.41
135,838.97
27,566.44
24,097.51
1946
159,105.89
147,314.59
11,791.30
9,742.96
1947
206,118.43
189,643.21
16,475.22
16,054.97
$915,018.72
$808,085.12
$106,933.60
$89,912.20
*145 In its returns for each of the years in question, Checker reported net income for 1942, 1943, 1944, 1946, and 1947, in the aggregate amount of $25,322.56. It reported losses from its business for 1945 and 1948 in the aggregate amount of $10,669.85. Accordingly, for the 7 years, the aggregate taxable net income which was reported for Checker's business was the net amount of $14,652.22. The net income and net loss which were reported are set forth in a schedule below. For the 6 years, 1942-1947, inclusive, the aggregate taxable net income reported by Checker amounted to $18,607.21. The net income of Checker reported in its original returns for the years 1942-1948, inclusive, the net income for each year which has been determined by the respondent, and the amounts of Checker's unreported taxable income are as follows: Net Income
Net Income
Unreported
Year
Reported
Determined * *146 Income
1942
$ 8,962.24
$ 16,015.99
$ 7,227.70
1943
12,500.04
31,581.08 **
15,247.89
1944
952.06
18,715.59 **
17,541.17
1945
(6,715.35)
17,705.08 **
24,097.51
1946
2,281.25
12,602.18 **
9,742.96
1947
626.97
16,645.89 **
16,054.97
1948
(3,954.50)
20.51 **
2,875.50
$14,652.22
$113,286.32
$92,787.70
In its original returns, Checker reported gross income for the years 1942-1948, inclusive, in the aggregate amount of $763,970.37, as the following schedule shows. For the 7-year period, Checker's total receipts amounted to at least $856,758.07, which is the total of gross receipts which were reported, plus its unreported taxable income, as the following schedule shows: Gross Income
Unreported
Total
Year
Reported
Taxable Income
Receipts
1942
$ 75,158.85
$ 7,227.70
$ 82,386.55
1943
107,864.88
15,247.89
123,112.77
1944
102,851.78
17,541.17
120,392.95
1945
103,625.87
24,097.51
127,723.38
1946
92,790.46
9,742.96
102,533.42
1947
125,491.97
16,054.97
141,546.94
1948
156,186.55
2,875.50
159,062.05
$763,970.37
$92,787.70
$856,758.07
Respondent reconstructed Checker's taxable income for each of the years involved by use of the bank deposits plus cash disbursements method. Checker maintained several business bank accounts in American Exchange Bank in Madison, Wisconsin, in which it deposited its receipts. The various *147 bank accounts were maintained for the deposits of operations receipts, Checker's garage receipts, the airline limousine receipts, insurance receipts, and other miscellaneous receipts. In addition, there was a bank account at the same bank in the name of Esther C. Bender. During all of the years 1942-1948, inclusive, Bender followed the practice of depositing some of the receipts from the operations of Checker in the Esther C. Bender checking account. A substantial part of such deposits (exact amounts are not determined) was not recorded in the cash receipts journal or in any other books of Checker, and therefore, was not included in gross income in Checker's tax returns. Respondent's determination of the amounts of Checker's unrecorded and unreported income for each of the years involved is largely the result of the finding out that the Esther C. Bender account was another bank account in which a large part of the current receipts of Checker was continuously and systematically deposited by Bender without the knowledge of his office bookkeeper, Freida Poster, or of the various employees in the office of an accountant hired by Bender to make up Checker's tax returns. Respondent's agents *148 determined that the net amounts of the bank deposits in all of the bank accounts of Checker, including the Esther C. Bender account, for the years 1942-1947, inclusive, were the amounts set forth in the following schedule. The record does not provide the net amount of all bank deposits for 1948 except in the case of the Esther C. Bender account for which total deposits are shown for the years 1942-1948 in the following schedule: Total
Gross Deposits
Deposits
Net Bank
E. C. Bender
Other Bank
Year
Deposits
Bank Account
Accounts
1942
$ 37,630.27
$ 27,872.16
$ 9,758.11
1943
85,737.25
38,201.24
47,536.01
1944
150,167.28
29,572.16
120,595.12
1945
150,819.63
35,251.52
115,568.11
1946
149,617.20
46,306.85
103,310.35
1947
173,839.67
46,217.51
127,622.16
1948
(not shown)
24,490.21
(not shown)
$747,811.30
$247,911.65
$524,389.86
Except for deposits of bank loans, the major part of all of the deposits in the Esther C. Bender bank account was receipts from the operations of Checker. An analysis of the deposits in the Esther C. Bender bank account is set forth hereinafter. In 1938, Bender employed a certified public accountant in Madison, Wilbur S. Grant, to perform bookkeeping services for Checker and to make up Checker's tax returns *149 each year. Grant set up a system of accounting records for Checker which is described hereinafter. Grant maintained an accountant's office and he employed several accountants. The personnel of his office changed from time to time. Grant assigned various employees to work on the bookkeeping services which he rendered to Checker. Grant was not hired to make audits of Checker's accounts and no audits were ever made. During the years 1942-1948, inclusive, Grant rendered the bookkeeping services he was engaged to perform, and for each of those years he prepared Checker's tax returns. Grant died on May 30, 1955. During the years 1946-1948, inclusive, Charles DuBois, a staff accountant for Grant, handled the bookkeeping and accountant service for Checker. He inquired repeatedly about the deposits to the Esther C. Bender bank account in the American Exchange Bank. He understood that this was an officers' personal account such as is sometimes used in a closely held corporation; that purchases for Checker were being made out of Bender's personal funds and that on Checker's books, for such transactions, the asset account would be debited, and that Bender's account on the books would be credited. *150 DuBois, in 1948, was not entirely satisfied with the explanations he was able to obtain and finally traced some of the deposits which had been made to the Esther C. Bender bank account to payments to Checker for its services by the Madison Board of Education which had not been entered in the office cash receipts daybook maintained by Freida. During 1946 and 1947, he accepted the explanation that the Esther C. Bender bank account was an officers' personal account, but by 1948 he believed that deposits in the Esther C. Bender bank account could not continue forever out of the past savings of Bender and Esther. The large size of deposits in the Esther C. Bender bank account seemed unusual to DuBois. By the end of 1948, DuBois began to suspect that all of the business receipts of Checker were not being recorded on Checker's books. He took it upon himself to make a detailed analysis of the deposits. By this analysis he determined that $9,557.38 of the amounts deposited in the Esther C. Bender account during the year 1948 represented business receipts which had not been recorded in Checker's cash receipts journal. His findings were discussed with Grant and Bender, and it was agreed that *151 the amount of $9,557.38 should be added to receipts for 1948. A journal entry reflecting this was made on the books. This additional income was reported in the Federal income tax return filed by Checker for the year 1948. Prior to this time, DuBois had relied entirely on the information in the cash receipts journal in preparing the income tax returns for Checker for earlier years. Investigations of Checker's state income tax returns for each of the years 1942-1948, inclusive, were made by the Wisconsin Department of Taxation. These investigations established that Checker had failed to report all of its taxable income for each of those years. The State of Wisconsin imposed double assessments for each year on Checker under the provisions of section 71.11(6) of the Wisconsin Statutes (1949). [2] On March 30, 1950, the double assessment penalty was imposed for the years 1944-1948, inclusive; and on May 2, 1951, the penalty was imposed for 1942 and 1943. The total penalty for the years 1944-1948 amounted to $7,651.09, plus interest, $554.38; and for 1942 and 1943, it amounted to $2,771.44. Checker paid the penalty and interest for the years 1944-1948, inclusive, in the above amounts. Checker *152 paid, as the penalty for 1942 and 1943, $1,724.80, plus interest. After the audit by the State of Wisconsin had disclosed the existence of unreported income, Checker filed amended Federal income tax returns for the years 1944-1948, inclusive, in 1950. The following schedule shows the amounts of net income reported on the original returns filed by Checker, the amounts of net income reported on the amended returns, the dates of the amended returns, and Checker's correct net income as agreed to by the parties: Net Income
Net
Reported
Income Reported
Agreed
Year
Original Return
Amended Return
Net Income
1942
$ 8,962.24
$ 8,962.24
$16,015.99
(March 15, 1944)
1943
12,500.04
14,748.84
31,581.08
(July 28, 1947)
1944
952.06
19,065.59
18,715.59
(July 20, 1950)
1945
(6,715.35) Loss
17,203.07
17,705.08
(July 19, 1950)
1946
2,281.25
6,037.87
12,602.18
(April 19, 1950)
1947
626.97
18,977.15
16,645.89
(July 20, 1950)
1948
(3,954.99) Loss
(2,429.31) Loss
20.51
(July 20, 1950)
Amended *153 Federal income tax returns for the years 1944-1948, inclusive, were prepared in 1950 by Harry W. Swanson, an associate of Grant, on the instructions of Grant, at which time the accountants realized that some of the income of Checker had been deposited during each year in the Esther C. Bender bank account and had not been recorded on the books or reported in the returns. The receipts of Checker were then determined, for the first time, by an analysis of all of the known bank accounts to which business income had been deposited, and eliminations were made for loans, transfer items, and any other item which did not represent taxable income. The unrecorded income for each year, as so determined, was then set up in the books of Checker. The amounts of the unrecorded income determined by this method were discussed by Swanson with Bender before they were recorded on Checker's books. Swanson represented Checker before the Wisconsin Department of Taxation. Waivers extending the period of limitations on the assessment of deficiencies in tax and penalties to a date beyond the issuance of the notice of deficiency were executed by Checker for the taxable years 1946 and 1948. The statutory notice *154 of deficiency was mailed to Checker Taxi Company on December 13, 1954. The facts relating to the method of keeping Checker's books and to Bender's practices are as follows: Prior to 1938, Bender, personally, maintained the bookkeeping records of Checker, and he turned over this information, at the end of each year, to whoever would prepare the year-end statements. In 1938, Bender hired Grant. Although Bender kept bookkeeping records of Checker prior to 1938, he knew very little about bookkeeping, and he has had no training in accounting. In 1938, Grant set up a double entry bookkeeping system for Checker, to replace its single entry bookkeeping system. A cash receipts book was maintained in the office of Checker in which were to be recorded all amounts of income received by the company. Freida Poster, a sister of Bender, was employed by Checker in the year 1941 to maintain the cash receipts book and to record therein all amounts received by Checker from the operation of taxicabs, school buses, airline limousines, hauling and drayage, and various other receipts. Bender arranged with Grant to have one of his men come to the office and instruct Freida about the method of keeping such *155 accounting record. During each of the years 1942-1948, inclusive, Checker maintained a cash receipts daybook, which book constituted the original record of entry of the receipts of the business. The cash book was kept during these years in the office of Checker by Freida. It was turned over periodically to Grant for the purpose of recording the receipts shown therein in the permanent records of the corporation. During the years 1942-1948, inclusive, the entries in the cash receipts book which had been made by Freida were inspected about once a month by a staff member from Grant's office. To them, it appeared that receipts were being recorded properly. In addition to the income journal, check books of Checker were kept and maintained in the office of Checker. Most of the checks issued by Checker were prepared by Freida. A general ledger and a cash disbursements journal were kept and maintained in Grant's office by his employees. At the end of each day, most of the taxicab drivers, limousine drivers, and truck drivers turned in waybills and currency to Freida. The waybills reflected the trips made by the drivers and the amounts collected by them. During the morning of the next day, *156 the currency turned in to Freida was counted, the waybills were checked, and the drivers' commissions were computed and recorded. Some of the currency might be used for cash payouts of expenses. Deposit slips were made up to deposit the balance of the currency in Checker's bank account at the American Exchange Bank which was in the name of Checker Taxi Company. On Monday of each week, deposits were also made in other less active bank accounts of the corporation, such as the insurance account, the accident account, the claims account, and the payroll taxes account. Currency was turned over to Bender to deposit in the bank accounts. Freida made a record of all amounts turned in to her by the drivers in the cash receipts daybook located in the office of Checker. Entries were made for all amounts received from taxicab, limousine, and truck drivers and from other sources. Taxicab drivers who owned their own cabs would not check in waybills with Freida, but pay a flat fee for operating under the company name. All of this income was received in cash. The drivers of the school buses did not submit waybills. The Board of Education of Madison was billed once a month for the school bus service *157 and it made payment by check. Occasionally, airline limousine service performed for the airlines would be paid for by check. All of the business receipts were recorded by Freida in the cash receipts daybook to the extent that she was aware that amounts had been received. During 1942-1948, inclusive, Bender, at times, received money, personally, from the drivers of taxicabs, limousines, trucks, and other employees of Checker. Also, he received, personally, in the mail, checks from customers of Checker in payment for airline limousine service, package deliveries, truck hauling, and school bus service. He deposited a great deal of such income of Checker in the Esther C. Bender bank account. He did not tell Freida about these receipts which he had received and deposited in the Esther C. Bender bank account. Therefore, Freida did not record such receipts of Checker's income in the cash receipts daybook, and it did not show all of the receipts from Checker's business. Bender knew that Freida maintained a cash book into which all of the receipts of the company were supposed to be recorded, and he knew where the book was kept in the office. Bender made all of the deposits in all of the bank *158 accounts of Checker. He made out all of the deposit slips for all of the funds which he received and deposited in the Esther C. Bender bank account. On the other hand, Freida made out deposit slips for Checker's receipts which she received. Thus, the moneys covered by the bank deposit slips which Freida made out were recorded in the office cash receipts daybook, but the moneys covered by the bank deposit slips which Bender made out were not recorded in the cash receipts daybook. Items of deposits of Checker's funds in the Esther C. Bender bank account were in rather large amounts compared to the size of items of deposits made in the bank accounts in Checker's name. Freida did not know that any of Checker's receipts were being deposited in the Esther C. Bender bank account during the years 1942-1948, inclusive. Bender at no time advised any of Grant's employees that business receipts of Checker were being deposited in the Esther C. Bender account, or that such receipts were not being recorded in the cash receipts book. He did not advise them of anything which would give them the impression that this account was anything other than a personal account in the name of his wife. Freida told *159 one of Grant's employees, DuBois, that deposits in the Esther C. Bender bank account must have been Bender's savings and Esther's earnings from the Madison Club. Freida's understanding at all times was that the Esther C. Bender bank account was not a bank account of Checker; that it was just an account with which she had nothing to do. Bender paid for most of the purchases of equipment for Checker. Some of such payments were made for Checker by checks drawn on the Esther C. Bender bank account. Bender also paid other expenses of Checker with checks which he drew on that bank account. Such checks were signed by Esther. Only Esther was authorized to draw checks on the Esther C. Bender bank account. She often signed several checks in blank and gave them to Bender to fill in. Large checks of Checker in disbursement of funds had to be approved by Bender. He knew what amounts of Checker's funds were being expended each year. Bender made deposits of various types of receipts in the Esther C. Bender bank account; some deposits were current receipts from the operations of Checker, and some were redeposits of checks which had been returned to Checker or Bender because of lack of funds of the *160 makers of the checks. These receipts represented gross income of Checker. Other deposits were proceeds from bank loans to Checker and from tax refunds, and there were transfers of money from other bank accounts of Checker to the Esther Bender bank account. Such deposits represented nontaxable funds. Also, other deposits were made of proceeds from sales of equipment of Checker. Such proceeds might, in some instances, not represent any taxable income to Checker if no gains were realized from such sales. The following schedule presents analysis of the annual deposits which Bender made in the Esther Bender bank account: Deposits in E. C. Bender Account
Deposits
Deposits
Total
Checker's Opera-
Proceeds
Deposits
Year
Deposits
tions Receipts *
Equip. Sales
Not Income ** *161 1942
$ 27,872.16
$ 24,372.16
0
$ 3,500.00
1943
38,201.24
33,801.24
$ 1,400.00
3,000.00
1944
29,572.16
23,572.16
1,000.00
5,000.00
1945
35,251.52
35,251.52
0
0
1946
46,306.85
23,691.45
11,273.00
11,342.40
1947
46,217.51
20,710.68
15,506.83
10,000.00
1948
24,490.21
9,890.21
8,600.00
6,000.00
Totals
$247,911.65
$171,289.42
$37,779.83
$38,842.40
During 1944, 1945, 1946, and 1947, Bender deposited checks in the Esther Bender bank account which he received in payment for school bus service from the Madison Board of Education in the total amounts of $1,080, $2,587.50, $1,754.25, and $7,556.90. These amounts are included in the figures for deposits in the above schedule. The Esther C. Bender bank account existed before 1942. It had been opened originally to put funds out of reach of creditors in the event any creditors tried to attach or get hold of funds. As of January 1, 1942, there was a balance in this bank account, and there were balances at the end of each of the years 1942-1948, inclusive. Respondent's analysis of Bender's withdrawals from the Esther C. Bender account established that some funds were withdrawn for Checker's use and some funds were withdrawn for the personal use of himself and his wife. The following schedule shows for each of the years involved, the bank balance at the beginning of each year, the totals of deposits and withdrawals during each year, and the year-end bank account balances: E. C. Bender Account
Balance
Total
Total
Balance
Year
Jan. 1
Deposits
Withdrawals
Dec. 31
1942
$ 3,400.85
$ 27,872.16
$ 19,918.43
$11,354.58
1943
11,354.58
38,201.24
38,617.71
10,938.11
1944
10,938.11
29,572.16
32,426.50
8,083.77
1945
8,083.77
35,251.52
33,930.23
9,405.06
1946
9,405.06
46,306.85
44,621.60
11,090.31
1947
11,090.31
46,217.51
52,158.05
5,149.77
1948
5,149.77
24,490.21
28,064.80
1,575.18
$247,911.65
$249,737.32
*162 The following schedule shows the withdrawals for the purposes of Checker's business, and the withdrawals for the personal use of Bender and Esther during each of the years involved: Analysis of Total Withdrawals
E. C. Bender Account
Withdrawals
for
Withdrawals
Total
Checker's
for Per-
Year
Withdrawals
Bus.
sonal Use
1942
$ 19,918.43
$ 15,955.77
$ 3,962.66
1943
38,617.71
35,915.85
2,701.86
1944
32,426.50
17,148.19
15,278.31
1945
33,930.23
19,989.61
13,940.62
1946
44,621.60
41,689.47
2,932.13
1947
52,158.05
47,730.78
4,427.27
1948
28,064.80
25,620.52
2,444.28
$249,737.32
$204,050.19
$45,687.13
The accountants in Grant's office knew that payments of some of Checker's expenses and for some of Checker's equipment were made by checks drawn on the Esther C. Bender bank account, and they were given such cancelled checks. The accountants understood during the years 1942-1947, inclusive, and until they found out the facts about the matter, that such payments for Checker were made out of the Benders' personal funds. Therefore, the accountants made entries in Checker's books crediting the single officers' account which was maintained in 1942, 1943, and 1944, and later, the individual officer's account of Bender. As is stated hereinafter, *163 such credits to the personal accounts of Bender and Esther in Checker's books led to the issuance of additional shares of stock to Bender and Esther. The accountants were not shown any of the bank deposit slips for deposits in the Esther C. Bender bank account. During the years involved, Checker's equipment increased as the following shows. In 1942, Checker had 3 taxicabs, 3 school buses, 3 pickup trucks, and 1 moving van. By the end of 1948, it owned 24 taxicabs, 7 school buses, 3 airline limousines, 3 pickup trucks, and 1 moving van. Bender made the purchases of new equipment and arranged for the financing. Checker's equipment account rose from a net (after depreciation reserves) of $9,334.80 on January 1, 1942, to $92,224.45, as of December 31, 1948. Checker's net worth (capital stock plus surplus), per books, rose from $9,162.93 on January 1, 1942, to $124,637.58 on December 31, 1948. Checker's paid-in or capital surplus was $6,700.23 during 1942, 1943, and 1944. As of December 31, 1945, the credit balance in Bender's personal account Checker's books was $33,817.71; and the credit balance in Esther's personal account was $9,903.47. On December 31, 1945, the officers' personal accounts *164 on Checker's books for Bender and Esther were debited $20,299.77 and $2,700, respectively, total $22,999.77, for "amount contributed to capital surplus;" and capital surplus was credited $22,999.77. Checker's paid-in or capital surplus as of December 31, 1945, increased to $29,700 according to the balance sheet in its return for 1945. This increase is accounted for by the above-stated credit to capital surplus of $22,999.77 from the Benders' personal accounts. On November 30, 1947, Bender's and Esther's personal accounts were debited $13,500 and $6,800, respectively, for new shares of capital stock, a total of $20,300. Also, on November 30, 1947, capital surplus was debited $29,700 for new shares of capital stock. This debt entry wiped out paid-in or capital surplus. On November 30, 1947, Checker's capital stock account was credited $50,000 (the total of the debits, $20,300 and $29,700). Checker's capital stock account was thereby increased to $60,000. The entry was explained in this way: "To record the corporation's increase in capital stock from 100 shares at $100 per share, to 600 shares at $100 per share, in accordance with certificate C-2971-1, issued by the Secretary of State *165 October 28, 1947." The new 500 shares of Checker's stock were issued 405 shares to Bender and 95 shares to Esther. The debits to the personal accounts on Checker's books of Bender and Esther in 1945 and 1947 in the respective, total amounts of $22,999.77 and $20,300 aggregated $43,299.77, which accounts for the major part of the new 500 shares of capital stock having a par value of $50,000. Only $6,700.23 par value of the new stock issued in 1947 was attributable to capital surplus as it existed at the end of 1944, and without any of the aforesaid debits to the officers' personal accounts and the corresponding credits to the capital surplus account. Accordingly, reducing the above sums to round figures, of the 500 shares of new Checker stock issued in November 1947, only 67 shares were attributable to existing capital surplus and 433 shares were attributable to clearing credit balances of $43,299.77 in the officers' personal accounts to capital surplus. Esther's 95 shares of new stock were attributable to the debits to her personal account of $2,700 on December 31, 1945, and of $6,800 on November 30, 1947, a total of $9,500. Bender's 405 new shares of capital stock were attributable, *166 338 shares to the debits to his personal account on December 31, 1945 and November 30, 1947 in the amounts of $20,300 (round figure for $20,299.77) and $13,500, respectively, total debits of $33,800; and 67 shares were attributable to the paid-in or capital surplus of $6,700 which existed at the end of 1944. The Esther C. Bender bank account was used by Bender, in part, at least, as a means for diverting some of Checker's income from its business in each of the years 1942-1947, inclusive, away from the corporation bank accounts of Checker, and as a means for concealing, or suppressing, some of Checker's earnings. Since the earnings of Checker which were deposited in various bank accounts in the name of Checker were earnings which were recorded in Checker's cash receipts daybook and journal; and since none of the earnings of Checker which were deposited by Bender in the Esther C. Bender bank account were recorded in the cash receipts daybook, Bender's diversion of some of Checker's earnings to the Esther C. Bender bank account was also a method for concealing some of Checker's earnings from the accountants who made up Checker's income tax returns, and therefore, of not reporting all *167 of Checker's earnings for each of the years 1942-1947, inclusive. The accountants for Checker relied entirely on the cash receipts journal as recording and reflecting all of the income of Checker. The income reported in the returns of Checker for 1942-1947, inclusive, was the income shown by the cash receipts journal maintained by Freida in the office of Checker. It was not possible for the accountants to determine that all of Checker's income was not being properly recorded in the cash receipts journal unless a complete audit was made each year. None was ever made. Bender did not employ the accountants to make any annual audit of Checker's business. Rather, he employed them to determine Checker's total income by means of reference to the bookkeeping records. Even if complete audits had been made for each year, the auditors might not have ascertained readily the total amount of Checker's income which was being diverted by Bender to his wife's account. Nevertheless, when funds were disbursed during each of the years 1942-1947, inclusive, from the Esther C. Bender bank account to pay expenses of and to buy equipment for Checker, earnings of Checker were being used for those purposes *168 to the extent that funds in the Esther Bender bank account were current or accumulated earnings of Checker and proceeds from sales of Checker's assets. Checker filed false and fraudulent income tax and declared value excess profits tax returns, and excess profits tax returns, for the years 1942, 1943, 1944, 1945, and 1947. The deficiencies in taxes for those years are not barred. Part of each deficiency for each of the years 1942-1947, inclusive, was due to fraud with intent to evade tax. Income Tax Liability of Robert and Esther Bender Bender was born in 1900. His formal education stopped when he reached the sixth grade. While he was still in school, and at the age of fourteen years, he started in the "taxi" business by driving a hotel, horsedrawn hack. He continued to drive taxicabs until 1925 when he purchased a half interest in the Checker Taxi Cab business at Madison. Bender has been married to Esther Bender for 33 years. There is one child born of the marriage, a daughter, who is now 28 years of age. At the time Esther Bender was married, she was working for the Madison Club as a clerk. Since her marriage she has continued in the same position. She was employed by the Madison *169 Club during the years 1942-1948. Her total length of service with the Madison Club is 38 years. In his individual income tax returns for each of the years 1942-1947, inclusive, Bender reported gross income, net income, and income tax as are set forth below; and in the joint return for 1948, Bender and Esther reported income and tax as are shown below: Gross
Income
Year
Income
Net Income
Tax
1942
$4,800.00
$4,058.29
$ 319.23
1943
7,200.00
6,532.16
1,031.72
1944
5,889.20
5,280.43
935.10
1945
6,558.00
5,382.72
850.68
1946
7,699.76
7,199.76
1,348.93
1947
7,187.35
6,687.35
1,214.77
1948
9,783.22
8,804.90
1,245.76
In the returns for the years 1942-1948, inclusive, Bender's reported income was chiefly from three sources, Checker, Norris Court Garage, and interest; and in the joint return for 1948, Esther's income from Madison Club was included. The gross income which was reported from such sources was as follows: Norris
Madison
Year
Checker
Garage
Club
1942
$4,800.00
1943
7,200.00
1944
5,433.37
$ 455.83
1945
5,600.00
958.00
1946
6,000.00
1,699.76
1947
6,000.00
1,187.35
1948
7,200.00
664.97
$1,918.25 Some of the withdrawals from the Esther C. Bender bank account during the years 1942-1948 were used by Bender and Esther for their personal uses. The *170 amounts of such withdrawals, $45,687.13, were as are set forth below. They represent about 21.8 per cent of all of the deposits of Checker's funds in the Esther C. Bender bank account in the total amount of $209,069.25, which is the total of deposits of Checker's earnings, $171,289.42, and of proceeds from sales of equipment, $37,779.83. Withdrawals from E. C. Bender Bank
Account for Personal Use
Year
1942
$ 3,962.66
1943
2,701.86
1944
15,278.31
1945
13,940.62
1946
2,932.13
1947
4,427.27
1948
2,444.28
$45,687.13
Bender, for the years 1942-1947, inclusive, and Bender and Esther for the year 1948, did not report any of the funds of Checker which had been deposited in the Esther C. Bender bank account as income, in their individual income tax returns, or any of the above withdrawals. Some of the personal uses to which withdrawals from the Esther Bender bank account were applied were the payment of household and other personal bills, a payment of $4,000 on a home, and the purchase of a hunting lodge. As has been stated above, the Esther C. Bender bank account was used as a means for diverting and concealing part of Checker's earnings during each year, and when current earnings of Checker and proceeds from *171 sales of Checker's equipment were deposited each year in this bank account such funds were nevertheless Checker's funds. None of the sums (above stated) which petitioners withdrew for their personal use during each of the years 1942-1948 from the Esther C. Bender bank account represented their personal savings or income from sources other than Checker. During each of the years 1942-1947, inclusive, Bender realized income from Checker because of his withdrawals of Checker's funds in the amounts of $3,962.66, $2,701.86, $15,278.31, $13,940.62, $2,932.13, and $4,427.27, respectively, which he failed to report in his individual income tax returns; and during 1948, Bender and Esther realized income from Checker in the amount of $2,444.28 because of Bender's withdrawal of that amount of Checker's funds, which they failed to report in their joint return for 1948. Bender filed false and fraudulent income tax returns for the years 1942-1945, inclusive, and for 1947. The deficiencies for those years are not barred. Part of the deficiency for each of the years 1942-1947, inclusive, was due to fraud with intent to evade tax. The statutory deficiency notices were mailed on December 13, 1954. Waivers *172 were executed for 1946 and 1948. The stipulated facts are found as stipulated. Opinion HARRON, Judge: Issue 1. - In Docket No. 56622, Checker Taxi Company, it is conceded that for each of the years 1942-1947, inclusive, Checker realized taxable income in the amount, and failed to report taxable income in the amount, which respondent determined. Petitioner, Checker Taxi Company, while admitting that deficiencies in taxes for the years 1942-1945, inclusive, and for 1947, have been correctly computed, contends that they are barred by the statute of limitations. The first question is whether Checker filed false or fraudulent returns for the years 1942-1945, and 1947, so that under section 276(a), 1939 Code, the deficiencies are not barred. Under this question, the respondent has the burden of proof. Section 1112. In considering all of the evidence, it is recognized that fraud is never presumed, that it must be proved by clear and convincing evidence, and that the intent to evade tax is a specific intent. Henry S. Kerbaugh, 29 B.T.A. 1014, 1016, affd. 74 Fed. (2d) 749; M. Rea Gano, 19 B.T.A. 518. Also, that petitioner is not contesting the increases in its income is not an admission *173 of fraud. The concession of petitioner that its taxable income was understated for each of the years involved under this question does not, in itself, relieve the respondent of his burden of proof. On the other hand, in meeting his burden of proof, respondent is required to show that petitioner omitted substantial amounts of income from its return. Furthermore, a taxpayer's consistent and substantial understatement of income over a period of several consecutive years taken together with other circumstances can be clear and convincing evidence of fraud. Rogers v. Commissioner, 111 Fed. (2d) 987, 989; Halle v. Commissioner, 175 Fed. (2d) 500; Wickham v. Commissioner, 65 Fed. (2d) 527; Jack M. Chesbro, 21 T.C. 123, affd. 225 Fed. (2d) 674. Checker maintains that it did not file false or fraudulent returns because it kept a complete record of all of its income for each of the years involved; because it and its officers, Bender and Esther, relied upon a certified public accountant, Grant, to maintain its accounting records properly and to prepare its tax returns correctly; and because Grant was negligent in failing to report all of Checker's income for each year. Petitioners rely *174 upon Davis v. Commissioner, 184 Fed. (2d) 86; Wiseley v. Commissioner, 185 Fed. (2d) 263; Spies v. United States, 317 U.S. 492; Orient Investment & Finance Co. v. Commissioner, 166 Fed. (2d) 601; Haywood Lumber & Mining Co. v. Commissioner, 178 Fed. (2d) 769; Burton Swartz Land Corp. v. Commissioner, 198 Fed. (2d) 558; Drieborg v. Commissioner, 225 Fed. (2d) 216, and other cases, all of which have been considered. Although the accountant, Grant, died before the trial of these cases and no testimony of his was preserved, and none is before us, we have the testimony of the accountants in his office who were assigned to Checker, and we have the testimony of Bender. Consideration has been given to Bender's lack of knowledge of accounting procedures, to his limited education, and to the circumstance that he was busily engaged in directing the operation of Checker's business throughout the years. On the other hand, Bender, prior to 1938, had kept the single entry bookkeeping records of Checker, and he knew that Freida maintained a cash receipts daybook in Checker's office, and Bender knew where the book was located. Also, he operated the business. He knew how taxi drivers turned in *175 their cash; he knew that the business was growing; and he knew that he had cash to make substantial expenditures. He made all deposits in all of the various bank accounts. He admits that when he received cash from drivers, when Freida was not present, and when he received checks from Checker's customers in the mail, which Freida did not know about, either, he did not tell her about his receipt and possession of such funds, and he admits that he put "a lot" of money "in the Esther Bender account" under deposit tickets which he prepared, "lots of them." He knew that the Esther Bender bank account originally had been opened as a personal account, and that bank accounts of Checker were in the corporation's name. He knew that practically all of the deposits in the Esther Bender bank account were income of Checker. Furthermore, Bender did not tell Grant or any of Grant's staff accountants that he was continuously depositing income of Checker in the Esther Bender bank account although Bender had a great many opportunities to do so. In his testimony, Bender expressed the attitude that he relied on Grant and his employees to "take care of" checking over all records to see if all of Checker's *176 income was being recorded and reported in Checker's returns. In this connection, Bender stated that the accountants were given all of the cancelled checks and the bank statements of the Esther Bender account, and that he, Bender, did not pay any attention to the books at all. He testified that he would put money in the bank and he figured Grant "would get it," i.e., find out all about it from the checks and bank statements. Bender's explanations have been carefully considered. However, opposed to his assertion that Grant was expected to ascertain, without the help of a complete audit, all facts relating to Checker's income from bank statements as well as the cash receipts daybook, is the testimony of all of Grant's staff accountants who were assigned to look after Checker's accounts and records. All of these accountants knew about the Esther C. Bender bank account, and all of them understood that it was an officers' personal bank account. Some of these accountants testified that all that they saw relative to that bank account were the cancelled checks drawn on that account; and that they were told that only personal funds and no corporate funds were deposited in that bank account. *177 The accountants understood that they were to examine cancelled checks drawn on the Esther Bender bank account for Checker's business so as to make proper entries in Checker's books including credits to the officers' personal accounts on the books. DuBois, one of the accountants, testified that he had inquired several times whether some deposits in the Esther Bender bank account might not be deposits of Checker's income. Despite such inquiries, Bender did not inform his accountants, or Freida, that such was, in fact, true, and DuBois was given to understand by Freida, repeatedly, that the deposits in Esther's bank account came from Bender's savings and Esther's earnings. On the basis of this information DuBois did not include in the returns of Checker and of Bender any of the sums which had been deposited in Esther's bank account. Finally, the explanation taxed his credulity and he undertook to make his own investigation because the deposits in Esther's bank account grew to such large proportions. The evidence discloses that during each of the years 1942-1947, inclusive, the total deposits of Checker's income made by Bender in Esther's bank account exceeded $20,000 each year, and in *178 1945, amounted to over $35,000 and that for the 6 years, such deposits totalled over $160,000, plus proceeds from sales of Checker's equipment in the total amount of over $37,700. Bender followed a continuous and consistent practice of diverting income of Checker to his wife's bank account without disclosing his practice to his accountants. Upon careful consideration of the entire record and all of the circumstances, we are compelled to conclude that Bender knowingly and deliberately diverted substantial amounts of Checker's income during each year, and misled his accountants, for the purpose of concealing part of Checker's income for each year. Bender's indifference to whether complete accounting records of Checker's business were made and his professed reliance upon the omniscience of the accountants to locate all of Checker's income do not excuse him nor alleviate his falsely swearing to the correctness of Checker's tax returns. M. Rea Gano, supra; Wickham v. Commissioner, supra.The large number of specific diversions of Checker's income to Esther's bank account, the large dollar amounts thereof, the relation of the amount of such diverted income, over $197,000 during 6 years, *179 to reported net income for 6 years of only $18,606.72, tend to negate the contention that there were innocent omissions, accident, negligence, or oversight as the cause of Bender's failure to report all of Checker's income for each of the years 1942-1947, inclusive. The facts establish, instead, intentional, wilful omission of substantial amounts of income from Checker's returns. Rogers v. Commissioner, supra; Harry Feldman, 34 B.T.A. 517, 520. Bender has failed to give acceptable explanations for the substantial understatement of Checker's income in its returns for 6 consecutive years and we are convinced that they were due to fraud with intent to evade tax. Lashell's Estate v. Commissioner, 208 Fed. (2d) 430. Bender cannot succeed here, upon the facts before us, in avoiding the consequences of his acts by relying upon the preparation of Checker's returns by an accountant. Instead of exercising the care required of him as in Davis v. Commissioner, supra, and in Wiseley v. Commissioner, supra, Bender actually misled his accountants. The cases upon which reliance is placed are distinguishable from this case upon their facts. In order for reliance upon an accountant to be a defense *180 against the consequences of filing untrue tax returns and for such reliance to shield a taxpayer from the reach of the applicable provisions of the Internal Revenue Code, it must be shown that the taxpayer provided such agent with all of the required information from which true and correct tax returns could be made. Berlin v. Commissioner, 59 Fed. (2d) 996, certiorari denied, 287 U.S. 642; Tarbox Corporation, 6 T.C. 35; Hermax Co., 11 T.C. 442, affd., 175 Fed. (2d) 776. The deficiencies of Checker are not the result of a determination by the Commissioner of a question of law, or of fact, about which there could be a "frank difference of opinion or innocent errors made despite the exercise of reasonable care." Cf. Spies v. United States, supra, at page 496. The petitioner contends that complete accounting records were kept for Checker for all of the years involved. The evidence produced by the respondent shows that this was not true. Incomplete records of Checker's current receipts from its business existed. The lack of completeness, due to the omissions of entries of many receipts of income, was due to petitioner's election to deliberately withhold from his office bookkeeper *181 and from the various accountants the information about a great many receipts of income aggregating large amounts in each year, thereby causing continuous and repeated omissions of recording of income in Checker's books. Bender cannot pass on to his agents, the accountants, or to his bookkeeper, his employee, the responsibility for his calculated and overt acts of omission. Cf. Haywood Lumber & Mining Co. v. Commissioner, supra, at page 771, where it was noted that the taxpayer supplied a competent tax adviser with all the necessary information. Furthermore, Bender cannot attribute to them his commission of certain acts, namely, the system of making deposits in various bank accounts. Bender made all of the bank deposits. He deposited the unrecorded cash receipts of Checker in his wife's bank account with full knowledge that those receipts were not and would not be recorded in Checker's books. Under the facts before us, we are unable to find anything in the case of Checker which makes the doctrine of Hatfried, Inc. v. Commissioner, 162 Fed. (2d) 628, and Orient Investment & Finance Co., supra, and similar cases, applicable to the question before us. Our Federal tax laws are largely *182 self-assessing. They impose upon every taxpayer the duty of keeping and maintaining complete and accurate accounting records which clearly reflect income, and of filing honest and correct tax returns. Upon the entire record, we are obliged to conclude that Bender knew when he signed Checker's return for each year that all of Checker's income for each year was not reported in the return and that he proceeded to sign each false return with fraudulent intent of evading part of Checker's correct income tax. Joseph H. Imeson, 14 T.C. 1151; Herbert Eck, 16 T.C. 511, affd. 202 Fed. (2d) 750, certiorari denied 346 U.S. 822. It should be pointed out, also, that Grant and his staff of accountants did not err as a matter of accounting practice in the way the officers' personal accounts were maintained, i.e., in crediting those accounts with the amounts which were paid out of the Esther C. Bender bank account for Checker's expenses. Bender let them believe and understand that the Esther C. Bender bank account was a personal one in which personal funds were being deposited. If that had been true, and the accountants thought that it was, such credits to the officers' personal accounts on Checker's *183 books represented sound accounting practice where the corporation was wholly owned by the officers whose personal accounts were credited. There is no doubt that Bender's fraudulent intent is to be imputed to Checker, the corporation of which he was the chief stockholder and officer. Currier v. United States, 166 Fed. (2d) 346; Auerbach Shoe Co., 21 T.C. 191, 194, affd. 216 Fed. (2d) 693. It is not reasonable to conclude that Bender's diversion of some of Checker's income to his wife's bank account was motivated solely by personal desires, to cover up understatement of income in his personal returns. The omissions of income each year in Checker's returns resulted in lower excess profits tax as well as lower income tax. Bender, as the chief stockholder of Checker, stood to gain substantially, even though indirectly, if Checker's taxes for each year were reduced. Consideration has been given to the fact that in 1950, Checker filed amended returns for the years 1944-1948, inclusive, in which greatly larger income was reported. The conclusions set forth above are not affected by that fact. These amended returns were filed after the tax officials of Wisconsin had inquired into Checker's *184 state income tax returns and the double assessment penalty had been paid to Wisconsin on March 30, 1950 for the years 1944-1948, inclusive. Herbert Eck, supra; George M. Still, Inc., 19 T.C. 1072, affd. 218 Fed. (2d) 639. On this point, it is our opinion that there do not exist here the extenuating circumstances found by the Court to exist in Wiseley v. Commissioner, supra.
It is concluded that respondent's evidence shows clearly and convincingly that Checker filed false and fraudulent returns for the years 1942-1945, inclusive, and for 1947. It is so held. Respondent has amply discharged his burden of proof. M. Rea Gano, supra; Rogers v. Commissioner, supra.It follows that the deficiencies for 1942-1945, inclusive, and for 1947 are not barred. There remains the question whether any part of the deficiencies in taxes for the years 1942-1947, inclusive, was due to fraud with intent to evade tax. Respondent has the burden of proof under this issue. For the reasons already set forth above, it is concluded and held that part of each tax deficiency for each of the years 1942-1947, inclusive, was due to fraud with intent to evade taxes. There is, considering the entire record and *185 all of the circumstances, clear and convincing evidence that Checker's chief stockholder and officer, with intent to fraudulently evade taxes, consistently and repeatedly, diverted substantial sums of Checker's income to his wife's bank account during several consecutive years, where it was concealed, and that he deliberately withheld information of the diversions from the accountants who prepared Checker's returns. We are unable to accept or believe Bender's assertion that his diversions of Checker's income were devoid of fraudulent intent to evade Checker's taxes. We think it is highly improbable that he did not have in mind the benefits taxwise of suppressing the existence of substantial amounts of Checker's income, or that he did not know that his diversions of income to his wife's bank account, and his letting it be regarded as the repository of personal funds would result in reduction of Checker's liability for taxes for each year. Direct evidence of the specific intent of fraud is seldom available to prove fraud, and whether it exists must be determined from the conduct of the taxpayer and the surrounding circumstances. M. Rea Gano, supra; Lashell's Estate v. Commissioner, supra; *186 Rogers v. Commissioner, supra; Wickham v. Commissioner, supra. Issue 2. - In Docket No. 56618, Robert L. Bender, and Docket No. 56619, Robert and Esther Bender, there is the question whether there are deficiencies in income tax for each of the years 1942-1948, inclusive, in the amounts which have been determined. Deficiencies for 1946 and 1948 are not barred because waivers were executed extending the period within which taxes can be assessed and collected. Respondent now concedes that 50 per cent additions to the tax deficiencies of both petitioners for 1948 were improperly added. In Docket No. 56618, Robert L. Bender, the deficiencies are barred unless respondent, under his burden of proof, has proved that false or fraudulent returns for the year 1947, and for the years 1942-1945, inclusive, were filed. If that question is decided against petitioner, Robert L. Bender, there is the question whether part of the deficiency for each of those years was due to fraud with intent to evade tax, under which respondent has the burden of proof. We consider first whether false or fraudulent returns were filed by Bender for the years involved. Inherent in this issue is the question whether *187 Bender failed to report all of his income for each of the years involved, and, therefore, filed false or fraudulent returns. In meeting his burden of proof under this question, respondent is required to prove that Bender omitted a substantial amount of income from his return for each year, but he is not required to prove the precise amounts of unreported taxable income realized by petitioner. Halle v. Commissioner, supra; Stinnett v. United States, 173 Fed. (2d) 129, cert. denied 337 U.S. 957; United States v. Johnson, 319 U.S. 503; Estate of W. Y. Brame, 25 T.C. 824. Hereinafter, it is stated that we are of the opinion that respondent's computations of the amounts of income which Bender realized in each of the years involved by virtue of his diversions of income of Checker to the Esther C. Bender bank account are incorrect. For reasons which are set forth hereinafter, our conclusion is that the income realized by Bender during the years 1942-1947, inclusive, and by Bender and Esther in 1948, consisted of the amounts of Checker's funds which they withdrew from the Esther C. Bender bank account in each year for personal use. Those amounts are set forth in the Findings of Fact, *188 and the first question now considered is with respect to those amounts. Bender used substantial amounts of Checker's income in each year for his personal use. He knew that the source thereof was the income of Checker and the proceeds of sales of its equipment which he deposited in his wife's bank account. He knew the amount of his authorized salary from Checker in each of the years involved, and the amounts of his income from Norris Garage. As an officer of Checker he was aware of the resolutions in the Checker corporation's minute book of directors' meetings which were duly adopted, which fixed the amount of his salary in each year. His salary was $4,800 in 1942 and 1943; it was $5,600 in 1945; and it was $6,000 in the years 1946-1948, inclusive. Exhibit 41 does not state what his authorized salary was for 1944, but Bender reported more than $4,800 and less than $5,600, and so it is assumed that his authorized salary for 1944 was not more than $5,600, the amount authorized for 1945. Bender's withdrawals of Checker's income for his personal use in 1942 were close to the entire amount of his authorized salary; for 1943, they were over one-half; for 1944, they were $15,278.31, which *189 is close to three times $5,600; for 1946, they were close to one-half; for 1947, they were about two-thirds. For the 6 years, 1942-1947, inclusive, Bender's withdrawals totaled $43,242.85. For those years, Bender reported gross income in the total amount of $39,334.31. It is concluded and held that Bender, with fraudulent intent to evade tax, failed to report substantial amounts of income in each of the years 1942-1947, inclusive, and that he filed a false and fraudulent return for each of those year. Respondent's evidence clearly and convincingly establishes that a false and fraudulent return was filed for each year. The reasons for our conclusions are practically the same as are set forth under Issue 1, relating to Bender's continued and consistent practices of diverting some of Checker's income to his wife's bank account during several consecutive years, and it would involve unnecessary repetition to restate them. We are unable to believe that Bender was not fully aware of the fact that his use of Checker's income each year, over which he had complete control, in substantial amounts, and his failure to acquaint the accountants who made up his personal tax returns that he was using *190 such income, would not serve to reduce to a considerable extent his income tax liability for each year. It is held that the deficiencies in income tax for 1947 and for the years 1942-1945, inclusive, are not barred. It is held, also, that part of the deficiency for each of the years 1942-1947, inclusive, was due to fraud with intent to evade tax. M. Rea Gano, supra; Arlette Coat Co., 14 T.C. 751; Drieborg v. Commissioner, supra.
The next question is whether funds of Checker which were deposited in a bank account in the name of Esther C. Bender constituted corporate distributions to a stockholder, Bender, in all of the years involved, and to Bender and Esther in 1948, which are taxable as ordinary income and long-term capital gains under the provisions of section 115. Respondent determined that such deposits, in each of the years 1942-1948, inclusive, are taxable as ordinary income to the extent of the accumulated earnings of Checker at the end of each year; that any excess constituted nontaxable return of capital to the extent of the basis of the stock of Checker in the hands of Robert and Esther; and that any amount remaining is taxable as longterm capital gain in each year. Bender *191 argues that the Esther Bender bank account was a corporate account of Checker, and that, therefore, no part of the deposits therein represented distributions to him. Respondent has not explained how he computed the amount of constructive dividends of Checker which petitioners received. It is necessary for the parties to work out the correct amounts under a Rule 50 recomputation. In principle, respondent correctly determined that Bender, and both petitioners in 1948, realized constructive dividends from Checker, but it is held that such constructively received dividends are limited to the amounts used each year for personal uses because the evidence shows that except for the total amount which petitioners used each year for themselves, the balance, roughly, of the diversions each year of Checker's income was used to pay Checker's expenses and to purchase equipment for the corporation. The Findings of Fact set forth the amount of the withdrawals used each year for Checker's business. During the entire period, 1942-1948, inclusive, total funds of Checker deposited in the Esther C. Bender bank account amounted to $249,737.32, of which $204,050.19 was used in Checker's business, and $45,687.13 *192 was used by the Benders, personally. In this respect, the Esther C. Bender bank account served as a bank account of Checker. If respondent has treated the entire $249,737.32, that is to say, the amount of total deposits to Esther's bank account each year, as distribution of Checker's funds, he has erred. The diversions through the deposits in Esther's bank account constituted a device for concealing all of Checker's income each year for tax purposes, but, nevertheless, $204,050.19 of those diversions, in fact, remained in Checker's business. Furthermore, the crediting of amounts used to pay Checker's expenses to the officers' personal accounts was a sham and constituted part of the entire subterfuge. It has been found in the Findings of Fact that of 500 shares of new stock of Checker issued to Bender and Esther, 95 shares were attributable to the credits in Esther's personal account on Checker's books; and 338 shares issued to Bender were attributable to the credits in his personal drawing account. In fact, it is clear in the record, that all of the so-called credits to both personal accounts, except credits to Bender's account in the amount of $6,700.23, did not represent advances *193 by the Benders to Checker out of their own funds, and they were merely entries which reflected Checker's use of part of its unreported income which, although it had been put in Esther's bank account, remained, nevertheless, in Checker's business. This was a pulling-up-by-one's-own-bootstraps operation, which had no reality. Petitioners are not to be penalized and charged with the receipt of income of Checker which they did not in fact receive because it was used by Checker. Petitioners did not have the use of $204,050.19 of Checker's unreported income. It is held that only the withdrawals in each year of Checker's funds in excess of what remained in Checker's business and was used to pay its expenses ($204,050.19), i.e., $45,687.13 used personally by the Benders, constituted taxable distributions to petitioners under section 115. It is held, further, that the amount of withdrawals of $45,687.13, broken down to the annual amounts devoted to personal use constituted ordinary income to petitioners only to the extent that Checker had earnings and profits for the years in which sums were withdrawn for personal use; Commissioner v. Timken, 141 Fed. (2d) 625; Charles G. Duffy, 2 T.C. 568, 569. *194 The bookkeeping entries in the personal drawing accounts are not controlling, and the new shares of stock which were issued were mere paper and were not evidence of contributions of new capital, except as may be agreed to by the parties with respect to 67 new shares received by Bender. Cf., Drybrough v. Commissioner, 238 Fed. (2d) 735, modifying United Mercantile Agencies, Inc., 23 T.C. 1105. For each of the years 1942-1948, inclusive, the respondent has determined deficiencies in the taxes of Checker. It is held that the tax deficiencies of Checker for each year will reduce Checker's profits and earnings available for distribution to its stockholders. Estate of Esther Stein, 25 T.C. 940, 965-967; Stern Brothers & Co., 16 T.C. 295, 322-323. In Drybrough v. Commissioner, supra, the Court said: "* * * Both common sense and realism require the conclusion that the corporate taxes attributable to the diverted income should be excluded from the corporation's earnings and profits under the circumstances of this case. * * *" Accordingly, the parties, under Rule 50, will agree upon how much of the total used by petitioners for their personal use in each year was ordinary income, and how *195 much was long-term capital gain. Upon making this recomputation, it may be that for some year there will be no deficiency. If so, the 50 per cent addition under section 293(b) falls. Decision will be entered for the respondent in Docket No. 56622. Decisions will be entered under Rule 50 in Dockets Nos. 56618 and 56619. Footnotes
1. Consolidated with Docket No. 56618, are the following: Docket No. 56619, Robert L. and Esther C. Bender; Docket No. 56622, Checker Taxi Company.↩
*. After various adjustments, including additional deductions and disallowed deductions, which are not in dispute. **. Officers' compensation, including Esther Bender, disallowed for 1943, $3,500; for 1944, $1,100; for 1945, $1,100; for 1946, $1,100; for 1947, $1,100; for 1948, $1,100.↩
2. Wisconsin Statutes (1949) Sec. 71.11 Administrative provisions; penalties. * * *
(6) Double Assessment. Any person failing to make an income tax report or making an incorrect income tax report, with intent in either case to defeat or evade the income tax assessment required by law, shall be assessed at twice the normal income tax rate by the proper taxing authority. Such increased assessment shall be in addition to all other penalties of section 71.11↩.
*. Includes redeposits of checks which had been returned because maker did not have sufficient funds. ↩
**. Includes deposits of tax refunds, bank loans to Checker, transfers of cash from other bank accounts, and such nontaxable items.