SAM AND ESTELLE RATNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ratner v. Commissioner
Docket No. 10535-75.
United States Tax Court
T.C. Memo 1981-333; 1981 Tax Ct. Memo LEXIS 405; 42 T.C.M. (CCH) 251; T.C.M. (RIA) 81333; June 29, 1981
Barry L. Guterman, for petitioner Estelle Ratner. Darwin R. Thomas, for respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined, by statutory notice of deficiency dated September 19, 1975, the following deficiency *406 in and addition to petitioners' 1966 Federal income tax: Deficiency
Addition to Tax
in Tax
Sec. 6653(b), I.R.C. 1954 [1]
$ 4,710.31
$ 2,355.16
On March 8, 1979, respondent served on Sam Rather and Estelle Ratner separate Requests for Admissions pursuant to Rule 90, Tax Court Rules of Practice and Procedure.
As of November 8, 1979, neither Sam Ratner nor Estelle Ratner had responded to the Requests for Admissions. On that date, respondent filed a Motion for Summary Judgment as to both petitioners on all substantive issues in the case, relying on Rule 90(c), Tax Court Rules of Practice and Procedure, [2] to conclusively establish the facts. On November 28, 1979, Estelle Ratner filed a Motion for Permission to File Response to Request for Admission, asking that this Court permit her to respond to the *407 Request for Admissions which respondent served upon her in an untimely fashion and thereby permit the issues to be tried on the merits. At the hearing on respondent's Motion for Summary Judgment held on December 3, 1979, respondent moved to withdraw his motion for summary judgment as to Estelle Ratner. We granted respondent's motion to withdraw his motion for summary judgment as to Estelle Ratner, granted respondent's motion for summary judgment as to Sam Ratner insofar as it related to the deficiency in income tax for 1966 and the fraud penalty and granted Estelle Ratner's motion for permission to file a response to respondent's request for admissions served upon her. Trial was then had as to Estelle's liability for the deficiency and addition to tax. Sam did not appear at trial nor was he represented at trial. As framed by the procedural history of the case, the substantive issues are: (1) whether and to what extent the petitioners understated their gross income on their 1966 Federal income tax return; (2) whether any part of such understatement was due to the fraud of either Sam or Estelle Ratner; (3) whether Estelle Ratner qualifies as an "innocent spouse" under *408 section 6013(e). FINDINGS OF FACT Some of the facts have been stipulated, and others have been deemed admitted by Petitioner Sam Ratner (Sam) pursuant to Rule 90(c), Tax Court Rules of Practice and Procedure. The stipulation of facts, together with the exhibits attached thereto, and the facts deemed admitted by Sam, are incorporated herein by this reference. At the time the petition in this proceeding was filed, Petitioner Estelle Ratner (Estelle) resided in Woodland Hills, California. The petitioners timely filed a joint Federal income tax return for their taxable year 1966. Estelle and Sam were married from 1953 until June 1974. Estelle is a high school graduate with no bookkeeping or accounting experience whatsoever. She keeps very poor financial records. During 1966 Estelle was a housewife and mother of two children and was not otherwise gainfully employed. Estelle maintained no records of Sam's income for 1966. In 1964, Sam commenced a sole proprietorship business involving the publication, wholesale and retail distribution, and mail order sale of adult books, magazines, films, and related materials. Sam did business under the name "Prima Book & Publishing *409 Company." In early 1965, Sam formed a partnership with one William Snyder and continued the business under the name of "Wyngate & Bevins." In December 1965, Wyngate & Bevins was incorporated under the laws of the State of California. Sam and William Snyder each owed 50 percent of the corporation's stock. Wyngate & Bevins, Inc., continued to operate the adult materials business throughout 1966. Estelle was never an officer, director, employee of, or bookkeeper for Wyngate & Bevins, Inc. She was not a signatory on any bank accounts in the name of Wyngate & Bevins, Inc. Estelle despised her husband's business. It brought humiliation and embarrassment to the family. During 1966, Estelle suffered emotional and physical disorders as a result of her aversion to Sam's business. Sam never discussed the details of his business with Estelle. She was so disgusted with his business that she did not even want to know anything about it. During 1966, Sam was hounded by business creditors. It was Estelle's impression Wyngate & Bevins, Inc., was struggling along, on the brink of insolvency, and that it had real difficulty in paying its creditors. Sam completely controlled all of the *410 financial decision making of the petitioners' household. During 1966, Wyngate and Bevins, Inc., received business revenues in the form of both currency and checks. The books and records of the corporation show that during 1966 salary paid to Sam totaled $ 7,200, consisting of payments by check in the following numbers and amounts: Gross Amount of
Net Amount of Payment
Number of Payments in This
Payment
After Deductions
Amount Received in 1966
$ 350
$ 290.00
12
100
87.60
30
Sam gave Estelle an allowance in 1966 of usually from $ 250 to $ 290 per week, and sometimes more upon Estelle's request for additional money. Estelle used the allowance money to pay for family living expenses. She believed that the source of the allowance money was Sam's salary from Wyngate & Bevins, Inc. Petitioners maintained the following bank accounts in 1966: Name of Bank
Type of Account
Title of Account
Security First National
Checking
Sam or Estelle Ratner
Woodland Hills office
Security First National
Checking
Estelle Ratner
Woodland Hills office
Woodland Savings & Loan
Savings
Rebecca Schauer as Trustee for
Stuart & Diane Ratner
Security First National
Savings
Estelle Schauer as Trustee for
Woodland Hills office
Stuart & Diane Ratner
*411 As they are relevant to the instant case, details of petitioners' use of these accounts follow. A. Sam or Estelle Ratner
Estelle made all of the deposits to this account during 1966. She deposited three of Sam's $ 290 paychecks from Wyngate & Bevins, Inc., into the account as her allowance. All other deposits into this account which she made, except one, were also of allowance money which she used for family living expenses. On February 8, 1966, she deposited, on Sam's instructions, a $ 390 check. She was not free to use this $ 390 for living expenses or for any other purpose. The same day that she deposited it, Sam withdrew it. Sam possessed a check-book to the account and wrote checks on it. On or about March 7, 1966, Estelle closed the "Sam or Estelle Ratner" account and transferred the funds therein to the "Estelle Ratner" account, opened at the same time. The decision to change accounts was Sam's. Estelle believed at the time that his reason for doing so was to avoid creditors by dissociating his name from the funds. At this time it was Estelle's impression that Sam was very nervous about his creditors, who were actively pursuing him. She did not believe *412 that by ordering her to close the account and transfer the funds Sam was attempting to conceal income or assets from the Internal Revenue Service. During 1966, the following deposits of currency were made into the "Sam or Estelle Ratner" account: Amount of
Month
Currency Deposits
January
$ 770
February
400
March
204
$ 1,374
B. Estelle Ratner
Estelle opened this account March 7, 1966 on Sam's instructions, as discussed above. The funds in this account were used both by Estelle for living expenses and by Sam for other purposes. Sam as well as Estelle made deposits to and wrote checks on this account. Most of the deposits which Sam made to the account were of Estelle's allowance money. On September 15, 1966, however, Sam deposited $ 1,500 in currency and withdrew it September 26. This was an "extra deposit," i.e., a deposit of funds other than Estelle's allowance money. This was not money which Estelle was free to use for living expenses but was controlled by Sam and used for his purposes. Estelle also deposited other funds to this account besides her allowance money. These extra deposits were of money that San told her to deposit and *413 which he usually withdrew shortly thereafter. The following table shows the date, amount, currency portion, and subsequent disposition of Estelle's extra deposits: Amount of
Currency
Date
Extra Deposits
Portion
Source & Subsequent Disposition of Extra Deposits
3/15/66
$ 600.00
Deposit was a transfer of funds from "Rebecca
Schauer" account, discussed below. Sam withdrew
this amount from "Estelle Ratner" account
on 3/15/66.
5/ 3/66
500.00
Not withdrawn
6/27/66
2,825.00h
$ 2,700 of the deposit was a transfer of funds
from the "Estelle Schauer" account, discussed
below. $ 2,805.32 was withdrawn from "Estelle
Ratner" account by Sam on 6/29/66.
6/29/66
827.60
$ 740.00
Sam withdrew $ 589.25 on 9/5/66.
9/30/66
817.60
730.00
Sam withdrew $ 500 on 10/10/66.
10/25/66
1,000.00
1,000.00
Sam withdrew all of this amount on 10/26/66.
12/15/66
3,136.75
210.00
$ 2,900 of the deposit was a transfer of funds
from the "Estelle Schauer" account, discussed
below. Sam withdrew this latter amount from
the "Estelle Ratner" account on 12/16/66.
12/21/66
2,000.00
500.00
$ 1,500 of the deposit was a transfer of funds
from the "Estelle Schauer" account, discussed
below. The entire $ 2,000 was withdrawn the
following day (12/22/66) by Sam.
TOTALS
$ 11,706.95
$ 3,180.00
*414 At the time she made these extra deposits, Estelle assumed that the currency deposited was either from Sam's business or from gifts or loans made to Sam by members of his family. During 1966, eight of the $ 290 and twenty-nine of the $ 87.60 salary checks paid to Sam by Wyngate & Bevins, Inc., were deposited into the "Estelle Ratner" account. At the time she made the extra deposits, Estelle did not believe that they represented money which Sam was attempting to conceal from the Internal Revenue Service. During 1966, the following deposits of currency were made into the "Estelle Ratner" account: Month
Amount of Currency Deposited
March
$ 71.00
April
210.00
May
690.00
June
1,265.00
July
1,145.00
August
593.93
September
2,975.00
October
1,640.00
November
1,170.00
December
1,445.00
$ 11,204.93
C. Rebecca Schauer
Sam opened this account. He completed the signature card and had Estelle sign it "Rebecca Schauer," which is the married name of Estelle's mother. It was Sam's decision to open the account in this name. The money in the account was subject to the sole control of Sam, who kept possession of the passbook. It was Estelle's *415 impression, at the time, that Sam opened the account and transferred funds to it in order to evade his creditors. All deposits to the account were made either by Sam or by Estelle at Sam's direction. She made no deposits into the account without first being told to do so by Sam. None of Estelle's allowance was deposited into this account. The following chart shows the total amount of currency deposited to the account and the amount deposited by Estelle: Amount of
Currency Deposited
Date
Currency Deposited
by Estelle
1/ 3/6
$ 100
$ 100
1/ 5/66
1,000
2/ 8/66
100
100
2/14/66
100
100
2/18/66
100
100
3/ 7/66
125
125
3/28/66
50
50
4/25/66
200
200
$ 1,775
$ 775
In addition to the currency deposited as described above, an additional deposit of $ 100 was made April 1, 1966, for which a deposit slip could not be located. During 1966, Estelle made withdrawals from the account in the amounts of $ 600 on March 15 and $ 3,962.75 on May 16. The $ 600 was deposited in the Estelle Ratner account (see the listing of deposits under the "Estelle Ratner" section) on the same day it was withdrawn. Estelle withdrew and redeposited the $ 600 *416 because Sam ordered her to do so. The $ 600 withdrawal was made via a bankdraft drawn on Woodland Savings and Loan payable to Security First National Bank. Estelle endorsed the draft by signing the name "Rebecca Schauer" to it. Estelle used the $ 3,962.75 to open the Estelle Schauer account, discussed below. Estelle made the withdrawal and subsequent deposit because Sam told her to do so. The $ 3,962.75 withdrawal was made via a bankdraft drawn on Woodland Savings and Loan payable to Security First National Bank. Estelle endorsed the draft by signing the name "Estelle Schauer" to it. Estelle did not believe that by making deposits to the Rebecca Schauer account on behalf of Sam she was concealing income from the Internal Revenue Service. She believed that Sam transferred and directed her to transfer funds to this account out of fear of the creditors, in an attempt to put his assets beyond their reach. D. Estelle Schauer
On May 16, 1966, Estelle closed the Rebecca Schauer account and transferred the funds remaining therein ($ 3,962.75) to a new account which she opened the same day entitled "Estelle Schauer." She did so at Sam's behest. Estelle believed that Sam *417 wanted to transfer the funds to this account because he did not want them to be in his mother-in-law's name as he was afraid she might draw upon them. Estelle felt that he wanted no funds in her married name because he was fearful that his creditors might be able to reach them. "Estelle Schauer" is Estelle's maiden name. Sam exercised sole control over the funds deposited into this account. The following table shows the total amounts of currency deposited to the account during 1966 and the amount of such deposits made by Estelle: Total Amount of
Amount of Currency
Date
Currency Deposited
Deposited by Estelle
5/16/66
$ 40
$ 40
5/30/66
100
100
6/15/66
500
6/29/66
500
6/30/66
500
500
7/ 5/66
500
500
7/ 8/66
1,500
10/ 4/66
$ 4,080
$ 1,580
Estelle made these deposits because Sam told her to do so. Estelle made the following withdrawals from the account at Sam's request: Amount of
Subsequent Disposition of
Date
Withdrawal
Withdrawn Funds 6/27/66
$ 2,700
Deposited same day to Estelle Ratner
account, and withdrawn from the
latter account by Sam on 6/29/66.
12/15/66
2,900
Deposited same day to Estelle Ratner
account and withdrawn from the
latter account by Sam on 12/16/66.
12/21/66
1,500
Deposited same day to Estelle Ratner
account and withdrawn from the
latter account by Sam on 12/22/66.
*418 Estelle did not believe that by making the deposits to and withdrawals from the Estelle Schauer account on behalf of Sam detailed above, she may have been helping him conceal income from the Internal Revenue Service. Estelle assumed that the "extra" deposits of currency to the Estelle Ratner account, and all of the deposits of currency to the Rebecca Schauer and Estelle Schauer accounts, which she made at Sam's behest, were either from Sam's business or from gifts or loans from Sam's family. Monthly bank statements for petitioners' checking accounts were mailed to petitioners' residence, but Estelle did not review them or maintain a running balance in her checkbook. From the deposits of Sam's salary checks, described above, cash in the amount of $ 680.20 was held back. During 1966 no other cash was held back from any deposits made to either the Sam or Estelle Ratner account or to the Estelle Ratner account. During 1966, cash held back from all of the deposits made to the Estelle Schauer account totaled $ 10.80, and no cash was held back from any of the deposits made to the Rebecca Schauer account. During 1966, checks tataling $ 537.75 were deposited into an account *419 entitled "Prima Book & Publishing Company" at the Bank of America, Wilshire office. Sam Rather's signature appears on the signature card to this account as the authorized signature required to withdraw funds therefrom. The books and records of Wyngate & Bevins, Inc., show that a $ 3,000 check was written to William Synder on December 31, 1966. The check was issued in connection with Sam's purchase of William Snyder's stock in Wyngate & Bevins, Inc., for $ 6,000. Snyder agreed to sell Sam all of his stock in the corporation and entered into a covenant not to compete in the particular business in which the corporation was engaged. Steven S. Glick, who was the accountant for Wyngate & Bevins, Inc., at the time, made an entry on the corporate books to reflect the $ 3,000 disbursement based upon information supplied to him by Sam. Glick charged the disbursement either to "covenant not to compete" or to "noncompetition expense." A $ 40 check from one Richard D. Pina, dated May 11, 1966, payable to the order of "Sam Roberts" was deposited to the Estelle Ratner account during 1966. In 1963, Sam opened an account at the First National Bank of San Jose, California, under the fictitious *420 name "Sam Roberts." He signed this name to the signature card. In 1964, Estelle was added as an authorized drawer on the account. She signed the fictitious name "Estelle Roberts" to the card, and the name of the account was changed to "Sam or Estelle Roberts." Estelle signed the card in this name at Sam's behest. It was her impression at the time she joined the account that Sam was using it for the purpose of safeguarding his funds from creditors. Estelle drew a check on this account May 8, 1964, payable to "Estelle Ratner" for $ 240. She signed the check "Estelle Roberts." The check represented Estelle's weekly allowance. One check deposited to the Estelle Schauer account was for $ 500 drawn by one Harry Groner on the account of Beacon Distributors, Inc., payable to "Sam Roberts." The following table shows interest earned on petitioners' savings accounts during 1966: Interest Earned
Account
During 1966
Rebecca Schauer
$ 46.11
Estelle Schauer
[3] 129.00
Kings County
40.00
$ 215.11
The books and records of Wyngate & Bevins, Inc., show that during *421 1966, Sam received reimbursements from the corporation totaling $ 1,006.96. These records also show that during such year the corporation lent him $ 2,250, paid in the form of six checks as follows: Date
Amount
Subsequent Disposition
January 1966
$ 250
Unclear
February 1966
1,000
Deposited to Rebecca Schauer account,
2/10/66.
March 1966
500
Unclear
April 1, 1966
100
Unclear
May 16, 1966
150
Deposited to Estelle Ratner account,
5/17/66.
June 3, 1966
250
Deposited to Estelle Ratner account,
6/3/66.
TOTAL
$ 2,250
Estelle did not assist Sam in the preparation of information to be used in completing their 1966 Federal income tax return, nor did she assist Steven Glick, petitioners' accountant, in preparing the return or discuss it with him. Estelle signed the petitioners' 1966 joint income tax return after Sam brought the return home and told her to do so. She did not review the return prior to signing it. The front page of the return listed petitioners' adjusted gross income as $ 9,970. During 1966, Sam failed to maintain complete and adequate records of his income-producing activities in that the records kept failed to disclose all *422 of his monetary transactions and did not properly reflect taxable income. Although requested to do so, Sam refused to make available to the agents of the Commissioner the records which he did maintain. Sam was convicted of making a false statement to a governmental agency, and the conviction was affirmed on appeal. United States v. Ratner, 464 F.2d 101 (9th Cir. 1972). The following table shows the items of gross income returned by petitioners and those determined by the Commissioner: [4]
Returned by
Petitioners
Sam Ratner's salary
$ 9,100.00
Employer reimbursements
3,100.00
Deposits to Prima Book & Publishing Co. account
Interest
60.00
Dividends from Wyngate & Bevins, Inc.: Currency deposits to Sam or Estelle Ratner
account
Currency deposits to Estelle Ratner account
Currency deposits to Rebecca Schauer account
Currency deposits to Estelle Schauer account
Richard Pina check
Harry Groner check
Unexplained deposit to Rebecca Schauer
account
Payment by Wyngate & Bevins, Inc., to
Synder
Correcting entry [1]
Dividend exclusion
$ 12,260.00
*423 Determined by Commissioner
Sam Ratner's salary
$ 7,200.00 Employer reimbursements
1,006.96 Deposits to Prima Book & Publishing
Co. account
537.75 Interest
215.11 Dividends from Wyngate & Bevins, Inc.: Currency deposits to Sam or Estelle Ratner
account
$ 1,374.00
Currency deposits to Estelle Ratner account
11,204.93
Currency deposits to Rebecca Schauer
account
1,775.00
Currency deposits to Estelle Schauer
account
4,080.00
Richard Pina check
40.00
Harry Groner check
500.00
Unexplained deposit to Rebecca Schauer
account
100.00
Payment by Wyngate & Bevins, Inc., to
Snyder
3,000.00
22,073.93 Correcting entry [1]
(.87)
Dividend exclusion
(200.00)
$ 30,832.88 Understatement of
Gross Income
Determined by Commr.
Sam Ratner's salary
$ (1,900.00)
Employer reimbursements
(2,093.04)
Deposits to Prima Book & Publishing Co. account
537.75 Interest
155.11 Dividends from Wyngate & Bevins, Inc.: Currency deposits to Sam or Estelle Ratner
account
Currency deposits to Estelle Ratner account
Currency deposits to Rebecca Schauer account
Currency deposits to Estelle Schauer account
Richard Pina check
Harry Groner check
Unexplained deposit to Rebecca Schauer
account
Payment by Wyngate & Bevins, Inc., to
Snyder
22,073.93 Correcting entry [1]
(.87)
Dividend exclusion
(200.00)
$ 18,572.88 *424 OPINION We granted respondent's motion for summary judgment as to the deficiency in tax and fraud penalty against Sam. Although Sam was served with notice of trial, he neither appeared nor was he represented at trial, nor did he object to respondent's motion for summary judgment. The term petitioner, will hereinafter refer to Estelle who was represented at trial and who caused briefs to be filed in her behalf. Issue 1. Gross Income of Petitioner for 1966
It is axiomatic that the Commissioner's determination of the petitioner's gross income is presumptively correct and that petitioner bears the burden of proving it erroneous in any respect. Welch v. Helvering, 290 U.S. 111 (1933). Petitioner argues that all of the currency deposits which the Commissioner determined to represent income actually were the proceeds of non-taxable transfers, such as gifts, loans, and redeposits of currency previously withdrawn from the bank accounts, or of payments already included elsewhere in the Commissioner's computation, *425 such as cashed salary checks and employee business expense reimbursements. However, only two salary checks were not located among the deposits of checks to petitioners' bank accounts and these total $ 377.60 (one check for $ 290 and another for $ 87.60). Business expense reimbursements total only $ 1,006.96, and cash held back from deposited checks amounted to only $ 691. There was no evidence as to any specific loan or gift except for the loan from Wyngate & Bevins, Inc., to Sam for $ 2,250. However, only $ 850 of this amount could not be traced to checks deposited into the Rebecca Schauer and Estelle Ratner accounts. These amounts do not go very far to explain $ 18,433.93 of currency deposits. We cannot, on the record before us, conclude that any part of the currency deposits had non-taxable sources. Petitioner further argues that the $ 3,000 check from Wyngate & Bevins, Inc., to William Snyder dated December 31, 1966, was for a covenant not to compete rather than for the purchase of Snyder's stock. If the disbursement were for a covenant not to compete, it would not have been a constructive dividend to Sam because it would have directly benefited the corporation in its own *426 trade or business. There would have been no benefit to Sam because he was not in the corporation's trade or business at that time. See Palo Alto Town & Country Village, Inc. v. Commissioner, 565 F.2d 1388, 1391 (9th Cir. 1977); Bender v. Commissioner, 16 T.C.M. 502, 517, 26 P-H Memo. T.C. par. 57, 121, pp. 438-439 (1957), affd. 256 F.2d 771 (7th Cir. 1958). If the disbursement were part of the purchase price of the stock, however, it would have provided a direct pecuniary benefit to Sam as it would have aided him in gaining complete ownership of the corporation. Petitioner presented the testimony of Steven Glick, who has been petitioners' accountant and personal friend since 1962. Glick testified that in December 1966, Sam and William Snyder entered into a buy-out agreement whereby Sam would purchase all of Snyder's stock and Snyder would agree not to compete with Wyngate & Bevins, Inc., in the pornography trade. According to Glick, the total price was $ 6,000, $ 3,000 for the purchase of stock and $ 3,000 for the covenant not to compete, which was paid by the corporation via the check in question here. Glick stated that he, based *427 upon information supplied him by Sam, charged the disbursement to either "covenant not to compete" or "noncompetition expense." When asked whether he had actually seen the buy-out agreement, he stated that he could not recall whether he had seen the contract or had been told about it by the parties. Under these circumstances, we are not inclined to give much weight to Glick's testimony. His memory was unclear and much of his information was supplied by Sam, whose truthfulness is subject to serious question. We are compell to hold that petitioner has not carried her burden of proving by a preponderance of the evidence, that the $ 3,000 payment in question was for a covenant not to compete rather than for the purchase of the stock. Finally, petitioner contends that the bank accounts in question were actually corporate accounts of Wyngate & Bevins, Inc., and were used by the corporation in conducting its business, i.e., the funds, except for those used by Estelle for living expenses, were owned by the corporation and never distributed to petitioners for their personal use. We can find no evidence to support this theory. We have evidence only that Estelle made large deposits *428 to the accounts on Sam's instructions and that Sam Subsequently withdrew all or a large part of these amounts. There is no evidence as to what Sam did with these monies--whether he used them again in the corporation's business, salted them away in foreign bank accounts, or laundered them and used them to acquire assets in fictitious names. It is clear that he exercised absolute dominion and control over them. On the record before us, we cannot say that petitioner has shown by a preponderance of the evidence that these funds were not income to petitioners in the form of dividend distributions from the corporation. We sustain the Commissioner's determination that petitioners received the $ 30,832.88 of gross income described in the table, supra at 17. Issue 2. Innocent Spouse
The general rule is that each spouse is jointly and severally liable for the taxes due for any year with respect to which a joint return is made. Sec. 6013(d)(3). Estelle claims to be an "innocent spouse" and hence not liable for any of the deficiency in tax. Section 6013(e)(1) provides, however: (e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES.-- (1) IN GENERAL. Under regulations prescribed *429 by the Secretary, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. As we stated in Sonnenborn v. Commissioner, 57 T.C. 373 (1971): It is important that these provisions be kept in proper perspective. The filing of a joint return is a highly *430 valuable privilege to husband and wife since the resulting tax liability is generally substantially less than the combined taxes that would be due from both spouses if they had filed separate returns. This circumstance gives particular emphasis to the statutory rule that liability with respect to tax is joint and several, regardless of the source of the income or of the fact that one spouse may be far less informed about the contents of the return than the other, for both spouses ordinarily benefit from the reduction in tax that ensues by reason of the joint return. * * * But it must be kept in mind that Congress still regards joint and several liability as an important adjunct to the privilege of filing joint returns, and that if there is to be any relaxation of that rule the taxpayer must comply with the carefully detailed conditions set forth in section 6013(e). * * * [57 T.C. at 380-381.] Because the conditions set out in subparagraphs (A), (B), and (C) of section 6013(e)(1) are in the conjunctive, the spouse seeking relief from joint and several liability has the burden to prove that he or she satisfies each and every one of them. It is undisputed by the *431 parties that Estelle satisfies the conditions of subparagraphs (A) and (C) of section 6013(e)(1). The parties disagree as to whether she satisfies the condition which is required under subparagraph (B), i.e., whether she knew or had reason to know of the omissions from the gross income reported on the income tax return. Respondent, in his opening brief, emphasizes that Estelle claimed ignorance of the omission, relying upon McCoy v. Commissioner, 57 T.C. 732 (1972), to argue that she should not be relieved of liability for that reason alone. Respondent advanced little meaningful analysis or argument as to her actual knowledge of the omission or as to whether she had reason to believe income was omitted. Petitioner, on the other hand, in both her opening and reply briefs argued in great detail, citing numerous cases, to demonstrate not only that Estelle did not know of the omission but also that she had no reason to know of the omission. Respondent, in his reply brief, did not respond to petitioner's arguments. Respondent missed the point. In McCoy, supra, we held that lack of knowledge of the tax consequences of her husband's business *432 transactions could not excuse the taxpayer from joint and several liability under the innocent spouse statute. Estelle's ignorance was not concerned with the tax law but was concerned with the nature of her husband's pornography business. It was an embarrassment to Estelle and her family. Respondent virtually concedes that Estelle did not have actual knowledge of the omission of income from the joint return and we have found that to be true in our findings of fact. We believe the testimony of Estelle Ratner. The crux of the issue which respondent virtually ignored on brief is whether Estelle had reason to believe that income was omitted from the joint income tax return which she executed. In deciding this issue we have consistently applied several tests. To begin with, the standard to be applied is not whether Estelle personally had reason to know of the omission but, instead, whether a reasonably prudent person in Estelle's circumstances could be expected to know of the omission. Sanders v. United States, 509 F.2d 162, 166-167 (5th Cir. 1975); Terzian v. Commissioner, 72 T.C. 1164, 1170 (1979). [5]
*433 The following three tests are applicable to subparagraph (B) of section 6013(e)(1): (1) Unusual or lavish expenditures. There is no evidence of such expenditures here. Estelle testified quite convincingly of the modest standard of living of the Ratner family; (2) Participation in business affairs or bookkeeping. Estelle had no training in bookkeeping or business. Although she wrote checks she did not keep a running balance in the checkbook or reconcile the monthly bank statements. Except for the normal business transactions of a housewife all of her bank transactions were conducted under the direction of Sam. Moreover, all of those transactions, which included the use of fictitious names and phony signatures, were perpetrated by Estelle in the belief that they were designed to protect the assets of Sam and Wyngate & Bevins, Inc., from creditors. While we do not condone concealing assets from creditors we also refuse to draw the inference from such actions that they were also designed to omit income from the joint income tax return; (3) The guilty spouse's refusal to be forthright concerning the couple's income. Sam never discussed the details of his business with Estelle. *434 Sam controlled all of the financial decision making in the Ratner family. Estelle was completely under the domination of Sam. Sam led her to believe that some of the money being transferred among the accounts came from loans or gifts from members of Sam's family. Although the issue is factual, we conclude that the instant case is not to any great degree factually distinguishable from numerous decisions of this Court. Mysse v. Commissioner, 57 T.C. 680 (1972). [6]
Accordingly, we hold that Estelle is not liable for the deficiency in income tax. It follows that she is not liable for the fraud penalty. [7]
*435 Issue 3. Fraud as to Sam Ratner
Section 6653(b) provides as follows: (b) FRAUD.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse. The facts deemed admitted as to Sam were sufficient to establish fraud as to him. Therefore, we granted respondent's motion for summary judgment against San for both the deficiency in tax and the fraud penalty. In order that the record be clear, however, we will discuss here the facts upon which we granted respondent's motion for summary judgment against Sam as to the fraud penalty. The existence of fraud is a question of fact to be determined upon consideration of the entire record. Stratton v. Commissioner, 54 T.C. 255, 284 (1970). Respondent has the burden of proving *436 fraud and he must establish it for each taxable year involved by clear and convincing evidence. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Cefalu v. Commissioner, 276 F.2d 122 (5th Cir. 1960). To establish fraud, respondent must show that the taxpayer acted with the specific intent to evade a tax believed to be owing. Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941). Since direct evidence of fraudulent intent is seldom available, respondent may meet his burden of proof with circumstantial evidence. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971). Such evidence includes conduct calculated to mislead or conceal. Spies v. United States, 317 U.S. 492, 499 (1943); Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. 578 F.2d 1383 (8th Cir. 1978). The failure of Sam to object to the motion for summary judgment does not relieve respondent of his burden of proving fraud, Miller-Pocahontas Coal Co. v. Commissioner, 21 B.T.A. 1360 (1931). We have frequently held that respondent may carry that burden with evidence deemed admitted *437 in accordance with the Rules of this Court. See e.g., Gilday v. Commissioner, 62 T.C. 260 (1974); Strachan v. Commissioner, 48 T.C. 335 (1967). Understatements of income constitute evidence of fraud. Stone v. Commissioner, supra at 224. Sam has admitted that for 1966 he derived the above-listed amounts of gross income, $ 18,035.62 of which he failed to report. Sam has offered no explanation for this. He was a shrewd businessman in 1966 and undoubtedly was aware of his obligation to report his items of gross income. He exercised control over not only the pornography business but also complete control over the petitioners' household financial decision making. He was in a unique position to realize the amount of gross income petitioners earned. The failure to maintain records of income-producing activities is another indicium of fraud. Lollis v. Commissioner, 595 F.2d 1189 (9th Cir. 1979). Sam has admitted that he failed to maintain complete and adequate records of his income-producing activities. As a businessman, Sam was no doubt fully aware of the need to maintain adequate records. Sam also refused *438 to make available to the Commissioner's agents the books and records he did maintain. This is evidence of fraudulent intent. Otsuki v. Commissioner, 53 T.C. 96, 111 (1969). Finally, Sam concealed his ownership of property by holding title in the names of relatives and in fictitious names. This is some evidence of fraud, Furnish v. Commissioner, 262 F.2d 727, 729 (9th Cir. 1958), although there is evidence that Sam was motivated as well by a desire to evade creditors in maintaining these accounts. We conclude that respondent sustained his burden of proving fraud as to Sam for 1966 by clear and convincing evidence. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. Under Rule 90(c)↩, each matter whose admission is requested by one party is deemed admitted by the other party unless the latter, within 30 days after service of the Request for Admissions or such longer or shorter time as the Court may allow, responds to the request.
3. The $ 129 was stipulated to by the parties. Exhibit 13-M shows interest earned of $ 129.49.↩
4. These are the amounts listed in respondent's opening brief and add to a lesser sum than those in the statutory notice of deficiency.↩
1. Adjustment made by a bank to amount of petitioners' deposit in a previous year reducing their gross income in the year of the adjustment.↩
5. Johnson v. Commissioner, T.C. Memo. 1980-569↩.
6. Hackney v. Commissioner, T.C. Memo. 1976-99; Miriani v. Commissioner, T.C. Memo. 1976-122; Gurr v. Commissioner, T.C. Memo. 1976-338; Jones v. Commissioner, T.C. Memo. 1977-51; Carter v. Commissioner, T.C. Memo. 1977-322; Zinser v. Commissioner, T.C. Memo. 1978-256; Bonhag v. Commissioner, T.C. Memo 1980-138; Johnson v. Commissioner, T.C. Memo. 1980-569↩.
7. Hackney v. Commissioner, supra↩.